**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Erik Yarmey, | : | |
| | : | |
| *Plaintiff* | : | |
| | : | |
| | : | Civil Action No. _____ |
| v. | : | |
| | : | |
| University of Pennsylvania | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

## **COMPLAINT**

1.      From August 2017 to the Spring of 2019, Plaintiff Erik Yarmey was a student in University of Pennsylvania's ("Defendant" or "the University" or "Penn") College of Liberal and Professional Studies ("LPS") Post-Baccalaureate program ("the Program").

2.      As Defendant knew, Erik was a student with disabilities, including neuropathy and major depressive disorder.  Erik became sick in his first semester in the Program.  Due to his illness and subsequent surgery, through one of its agents, Penn extended his time to complete the Program through the end of the fall semester of 2019 at the earliest.  Erik planned out his course of study based on that timeline.

3.      In the summer and fall of 2018, despite Erik repeatedly reporting extreme stress, exacerbation of physical symptoms of his disabilities, and being hospitalized, Penn changed that timeline.  It imposed on Erik a deadline of end of summer 2019, and then the end of the semester of Spring 2019.  The new, twice-shortened timeline was completely arbitrary, contrary to the Program's guidelines and to prior agreements with Penn's agents, and impossible for Erik to satisfy given his choices in reliance on the prior timeline and his disabilities.

4.      As Erik struggled to meet this unachievable goal during the Fall of 2018, he became increasingly depressed.  During this time of struggle, agents of Penn failed to offer Erik counseling and support that it had agreed to provide through its student health and disabilities services offices.  In addition, high-ranking faculty and staff in the program disparaged Erik expressly because of his disabilities and suggested to him— a person who has dreamed of becoming a doctor since caring for his mother during a prolonged battle with brain cancer —that persons with disabilities simply should not be doctors.  This intensified Erik's depression-related feelings of hopelessness, anxiousness, and worthlessness.  It culminated in a suicide attempt in December 2018.

5.      Rather than assist Erik in stabilizing and healing so that he could complete the Program, Penn refused to accommodate Erik.  It continued to insist on the same deadline, and ultimately dismissed him.  Throughout his tenure in the Program, Erik received damaging, erroneous advice from faculty that only aggravated his severe distress. Plaintiff therefore brings this civil action under the laws of the United States and the Commonwealth of Pennsylvania to remedy Defendant University of Pennsylvania's violation of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and breach of contract.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.  This civil action arises under the laws of the United States, specifically 42 U.S.C. § 12181 [12101], *et seq.*, and 29 U.S.C. § 701, *et seq.*

7.      This Court has supplemental jurisdiction over the state law claim in this case pursuant to 28 U.S.C. § 1367.  Plaintiff's state law claim is so related to the claims that are within this Court's original jurisdiction that they form part of the same case or controversy.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred within the jurisdiction of this Court.

## PARTIES

9.     Plaintiff Erik Yarmey resides in Texas.

10.     Defendant University of Pennsylvania is a Pennsylvania private university, which is a recipient of Federal funding, located at 3440 Market Street, Philadelphia, Pennsylvania, 19104.

## PERTINENT FACTS

11.     Erik is a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act ("Section 504" or "Rehabilitation Act"), 29 U.S.C. § 705(20), and Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102.

12.     In August of 2017, Erik began attending University of Pennsylvania's College of Liberal and Professional Studies Post-Baccalaureate program.

13.     Prior to his enrollment in the Program, Erik received his B.S. and his Masters in Neuroscience from University of Texas Dallas.  Erik graduated college *cum laude* and from his master's program with a 3.88 grade point average.

14.     Erik was diagnosed with neuropathy following an accident in December 2013. He is also diagnosed with major depressive disorder and post-traumatic stress disorder.  Penn was made aware of the major depressive disorder in the fall of 2017.

15.     Penn was aware of Erik's diagnosis of neuropathy at the time of his application to the Program.  It became aware of Erik's mental health diagnoses during his time in the Program.

16.     In the fall semester of 2017, Erik became ill, which may have been a result of contact with a patient at the hospital during Erik's internship at Penn's medical school.  He required surgery.  Erik met with Penn's Student Intervention Services ("SIS") and requested information about a non-academic, or medical, withdrawal.

17.     On or about the beginning of November 2017, Erik met with Jacqueline McLaughlin, Director of Pre-Health Post-Baccalaureate programs, to discuss his surgery and options for medical leave.

18.     McLaughlin advised Erik that, pursuant to school policy, he would need to take a leave of absence of one year.  She stated that policy dictated that he move off campus during this time, and that he would not have any access to campus resources or facilities in that time.   She also advised that he would need documentation that he was healthy enough to return in order to return.

19.     There is no such policy at Penn with these restrictions for a medical leave.  Such a policy would be discriminatory.  There *is* a policy regarding incomplete coursework, which states that **"**Students who accumulate two or more incomplete grades in a given semester may be placed on a mandatory leave of absence until such work is finished. Students placed on a mandatory leave must complete all outstanding course work before they are allowed to re-enroll and continue with new work."  *See* Post-Baccalaureate Pre-Health Programs Student Handbook, *at* lps.upenn.edu/sites/default/files/2020-10/prehealth-handbook-2020-2021.pdf.  This was not, however, a case of simple failure to complete work.  It was an inability to complete work due to illness and recovery from surgery.  It would also not require a year to make up the work.

20.     In these meetings, McLaughlin also repeatedly brought up Erik's neuropathy, which he had discussed in his application for the Program, his interview for the Program, and in

meetings with the Program, and suggested that he take the leave of absence as an opportunity to get surgery for this condition.  Surgery was not indicated for Erik's neuropathy, which he had explained to the Program.

21.     Under these restrictions, Erik was adamant that he did not wish to take a leave of absence.  He asked McLaughlin about taking incompletes for his courses.  McLaughlin told him he could not.

22.     McLaughlin told Erik that if he wished to return to the program in January 2018 for the Spring 2018 semester, she would require that he drop both of his courses from the Fall 2017 term.  She told him he would not be able to attempt to complete them.  He would not be given a notation on his transcript—despite his documented illness and surgery which had temporarily incapacitated him—that there was any reason for this retroactive course drop. McLaughlin further told Erik he would need to be seen by a doctor and provide her with proof that his neuropathy (an unrelated, pre-existing condition not germane to the surgery or illness) would not cause any problems during the rest of his studies at Penn. Finally, McLaughlin advised that during the Spring 2018 semester, Erik would only be allowed to take one or two courses, and that one of the courses must be biochemistry.

23.     In light of these restrictions and his illness, Erik asked what the timeline would be for completion of the program.  McLaughlin assured him he would have an extension to complete the program, of at least one semester, possibly two. She stated, apparently ignoring the idiosyncratic restrictions set forth in paragraph 22, that he would not be penalized for being ill.

24.     The Post-Baccalaureate Program at Penn is advertised as a program that allows its students to work on a personal timeline.  *See* Penn Post-Baccalaureate Studies*, at*

lps.upenn.edu/non-degree-programs/pre-health ("[O]ur experienced advising team can help you develop a personalized profile of classes.").

25.     Despite being in recovery from his illness and related surgery, Erik started gathering the materials to meet the requirements that McLaughlin imposed on him alone, outside of any Penn policy, to continue his studies.  This included working to get an appointment with his neurosurgeon and completing the forms McLaughlin was requiring.

26.     Erik also met with several staff and different departments at Penn to try and obtain the actual policy for a leave of absence at the university.   He learned that it was not uncommon for students to take less than a year off during a leave of absence.  During this same time, Erik experienced extreme and increasing stress.  This slowed his recovery from surgery and exacerbated his neuropathy.

27.     During the Fall of 2018, Erik had been seeing a counselor at Penn's Counseling and Psychology Services ("CAPS"), Carmen Moedano.  She and Erik contacted McLaughlin to discuss a leave of absence of less than one year.

28.     McLaughlin again insisted on Erik taking a year "or more" in a leave of absence. She further suggested that Erik move back to Texas, second-guess his neurosurgeon's judgment that surgery was not yet indicated to address Erik's neuropathy, and reiterated that the Program would, despite having no such requirement in place as a matter of policy, require documentation from a doctor that Erik was healthy enough to return and would not again have his time in the program interrupted by any manifestation of his disabilities.

29.     McLaughlin also again required that Erik take only one course upon his return: Biochemistry.  Given his undergraduate and graduate educational background, Erik did not

believe that taking Biochemistry in that semester would be advantageous to his transcript or his professional goal of going to medical school. Erik explained this to McLaughlin.

30.     Again, Erik followed this meeting by seeking the medical documentation that McLaughlin required, which ultimately involved four medical appointments and extensive testing. He also continued looking for more information on a leave of absence and access to campus. He discovered that, contrary to what he was told by McLaughlin, Penn did have a card which permitted students on leaves of absence to access campus and university resources, sometimes referred to as a "Student on Leave Card."

31.     In a meeting in the end of November 2017 or the first week of December 2017, Erik talked with McLaughlin about everything he had learned about leaves of absence at the University. McLaughlin maintained that he needed a year off, maybe two, and again suggested that Erik might address his neuropathy with surgery. McLaughlin told Erik that if there were any other setbacks during his education at Penn, for *any* reason, that his status in the Program would be brought into question.

32.     Erik withdrew from both courses in the Fall of 2017, as McLaughlin had required, but chose not to take a leave of absence because he could not get an agreement with McLaughlin for it to last less than one year. He registered for the Spring 2018 semester in two courses. McLaughlin told him again she was requiring that he only enroll for one course. Under that demand, Erik changed his registration so that he was only enrolled in Biochemistry. In addition, Erik began working with the Ultrasound Division in Penn's health system as part of Penn's Academic Associates Program.

33.     In March of 2018, one of Erik's professors, Professor Elliot, suggested that Erik meet with Student Disability Services ("SDS") because Erik was unable to complete his midterm

due to effects of his neuropathy that drastically reduced his writing speed. Erik shared his diagnosis of neuropathy with Professor Elliot. This was the first time any person at Penn had suggested or mentioned SDS to Erik.

34.　　　Erik had an appointment with his neurologist on March 21, 2018.

35.　　　It was very difficult to schedule an appointment with SDS. Erik was finally able to do so with help from Professor Elliot.

36.　　　Erik then met with SDS. SDS told him that he qualified for time and a half on assessments due to neuropathy. Erik finished the rest of the Spring 2018 semester and summer 2018 with that time and a half accommodation.

37.　　　In the Summer 2018 session, there was a problem with Erik's University of Pennsylvania Health System ("UPHS") account. Penn locked him out of access to its online resources, buildings, and work two weeks. It was in June, which was right in the middle of his Physics course, which was a notoriously challenging course. It took hours and hours of Erik's time to remediate and it was not until he reported this to a doctor in the Ultrasound Division, who then intervened on Erik's behalf, that it was eventually fixed. This put him at a significant disadvantage relative to his peers. Keeping up with his courses became very stressful. The added stress led to manifestations of nerve pain from Erik's neuropathy and he had to be treated twice in the emergency department; on one occasion receiving nerve blocking injections to attenuate his pain.

38.　　　Erik told his Physics professor, Dr. Taylor, that the compressed schedule of the course and recent setbacks were causing him notable distress and the manifestation of nerve pain. Erik was constantly in fear of McLaughlin's ultimatum and an involuntary dismissal from the Program. During his Physics midterm, Erik had a breakdown that Dr. Taylor witnessed. Dr.

Taylor permitted Erik to take an incomplete for Physics. Erik completed the course in the start of the Fall 2018 semester.

39.     In the Spring of 2018, Erik was engaged in occupational therapy to address neuropathy symptoms. He was also traveling to Bryn Mawr regularly to be tutored by a Ph.D. in Physics.

40.     On or about June 25, 2018, Erik met with his academic advisor, Dr. John Zimmerman, who is one of four advisors in the LPS program. Erik and Zimmerman discussed the incomplete for Physics. Dr. Zimmerman told Erik that he would have until the end of the summer of 2019 to complete the program.

41.     Erik met with academic advisor Danielle Lever, Senior Advisor for the Pre-Health Program, in late July 2018. Lever told Erik that he had until the end of the summer 2019 to complete the program.

42.     The end of the summer of 2019 was a shorter timeline than what Erik expected, based on his previous conversation with McLaughlin, during which McLaughlin told Erik that he had until the end of the Fall 2019 semester to complete the program. It was also, yet again, an arbitrary deadline, imposed despite the Program's promise of an individualized experience and timeline that met each student's personal needs and goals. And, given McLaughlin's requirement that Erik take a single class in Fall 2018, it was impossible to achieve.

43.     Erik nonetheless set out to meet this new, arbitrary, shortened deadline. Erik sought to take an independent study in Fall 2018. Dr. Zimmerman and McLaughlin insisted that this required McLaughlin's approval.

44.     McLaughlin opposed to the independent study. Then, for no perceptible, legitimate reason, McLaughlin told Erik that he could register for the courses he wanted, but it

would mean that he must complete the program by the end of the spring semester of 2018. This pushed up his timeline another three months—a total of at least seven months earlier than what McLaughlin originally promised Erik. This deadline was unreasonable, contrary to Erik's wishes and known needs, and, yet again, in defiance of the Program's promise of an individualized experience and timeline.

45. Erik followed McLaughlin's recommendation not to do the independent study, but, with this twice-shortened deadline to complete the Program, had to take a heavy course load for fall 2018.

46. This course load, plus Penn's repeated denials of support, compounded Erik's depression-related symptoms, and particularly his feelings of anxiety and hopelessness. In late October 2018, Erik had to be treated inpatient at the hospital for stress. The hospital wanted Erik to remain for observation for at least a day, but Erik, who was terrified that Penn would use the absences as a reason to drop him from the Program, pleaded with the hospital to permit him to leave so he could get back to his classes. Erik returned to two of his classes that day—with bandages and his hospital bracelets on—so as not to miss them.

47. At this point, Penn was aware that Erik was exhibiting signs of significant stress and exhaustion, and that he may not be thinking clearly.

48. In fact, Erik had been meeting and regularly corresponding with Penn's Counseling and Psychological Services during this semester. CAPS operates under guidelines concerning students in an emotional crisis, which include a requirement that where a student is in crisis and may not be thinking clearly, providing notice to a student's dean and making sure that the student is not left unattended. *See* CAPS Dealing with a Crisis, at caps.wellness.upenn/edu/dealing/.

49.     In early November, Erik was admitted for inpatient care for an acute stress reaction and hypersomnolence due to stress.

50.     While in the hospital, one of Erik's colleagues from the Ultrasound Division was on his treatment team. Erik requested that his hospitalization be kept a private matter. However, upon his discharge, Erik was told that all of his colleagues in the Ultrasound Division had been informed of his hospitalization.  The stress of this violation further exacerbated Erik's anxiety and depression.

51.     After his hospitalization, Erik determined he could not continue with his schedule. He thought he might have to speak with a dean to address his schedule without fear of reprisal from McLaughlin.  But to speak with a dean, he would need a faculty referral.  He set up meetings with CAPS, Dr. Johnathan Wagner, and Dr. Michael Cancro—one of his professors— to talk about his course load and the twice-shortened timeline being imposed by Penn through McLaughlin.

52.     Erik met with Dr. Cancro in or about the second week of November.  In this meeting, Erik shared his struggles with the Program.  He described his extreme stress, hopelessness, and some of his stress reactions.  Erik explained that he needed to speak with a dean and relayed his belief that he needed a faculty recommendation to do so.

53.     Dr. Cancro responded first by asking Erik where Erik had earned his undergraduate degree.

54.     Then Dr. Cancro told Erik that people who come from certain institutions, certain state schools typically do not possess the cognitive acumen to succeed at a place like Penn.

55.     Erik told Dr. Cancro about how his injury, resulting disability, and surgical recovery had affected his time at Penn.

56. Dr. Cancro responded that no one cares. He told Erik that there are thousands of applicants for medical school and no one is going to sit there and read his sob story. Dr. Cancro concluded the meeting by telling Erik that there are people with "certain conditions" that make getting through medical school difficult or impossible, and that it really is "best for everyone" if those people just don't go to medical school in the first place. He told Erik that this was a reality that he would just have to learn to live with.

57. Dr. Cancro stated numerous times in the meeting that he was faculty at the medical school and served on the admissions committee for Penn's Perelman School of Medicine. He also claimed to be friends with high-ranking officials at Penn's medical school, including its dean.

58. Erik asked for accommodations for completing work due to his hospitalization, including an incomplete in the course. Dr. Cancro refused the incomplete. Erik offered a note to verify the hospitalization. Dr. Cancro suggested that Erik may have used his position as a research intern at the hospital to forge the note, and would not accept one.

59. Erik also met with Dr. Wagner, who, notably, was the professor for the class to which Erik had returned to in bandages and his hospital bracelets. Erik told Dr. Wagner how much he was struggling.

60. Dr. Wagner knew Erik was going to CAPS to address his extreme stress. He knew that Erik was dangerously sleep-deprived. Wagner even commented that Erik sometimes had trouble forming complete sentences during class discussions. Yet, in meetings with Erik in or about November 2018, Dr. Wagner chose to tell Erik that it was "kind of pathetic" that he did not have a higher grade point average in his master's program. He told Erik repeatedly that he should be embarrassed for not turning in all of his work on time. He told Erik that turning his

work in on time was so simple that even a grade schooler could do it. This greatly exacerbated Erik's feeling of worthlessness.

61.     Wagner admonished Erik for coming to his office hours regularly. He asked Erik why he had come to Penn in the first place. Erik stated that he had chosen Penn because it advertised a flexible and personalized curriculum, which Erik needed for his disabilities, of which Dr. Wagner was aware. Wagner claimed that he had done extensive research on post-baccalaureate programs and that he knew Penn was one of the strictest in the country. As such, he did not know why Erik would have chosen the Program. This made Erik feel further isolation and exacerbated his feeling of worthlessness.

62.     Neither Dr. Cancro nor Dr. Wagner helped Erik meet with a dean to address his unmanageable schedule. Instead, both asked Erik to understand *their* position and both noted that McLaughlin was their boss.

63.     Throughout November and December 2018, Erik continued meeting with Carmen Moedano at CAPS. He asked her for a meeting with a dean. She knew of his disabilities, his hospitalizations, his fear of failing in the Program, and that McLaughlin had become a trigger for his symptoms of depression and anxiety.  Moedano stated that the director of CAPS could refer Erik to a dean. She said she would ask the director to intervene in Erik's case. She requested more information from Erik.

64.     On November 25th and 26th, 2018, Erik sent emails to Carmen Moedano, from which it was evident that he was so severely depressed and anxious that he was at risk of self-harm or suicide.

65.     In his November 25, 2018 email, Erik stated:

I woken *[sic]* up the past couple of mornings with a splitting headache and my heart pounding out of my chest -I'm not sure if they're palpitations or what. I

haven't had time to go to any of my follow-up appointments from when I was in the hospital a couple of weeks ago and I'm too scared to book them because of the overwhelming amount of school work I'm currently buried under. I've tried talking to my Professors, and while a couple of them have been responsive others have been less so. I have an incredibly tight schedule to complete all of my make-up work by the end of the semester -even then, I have one professors who has just started giving me zeros despite trying to talk with him on several occasions. I'm not sure if this schedule is humanly possible, even for someone who is completely healthy. I think there is a high probability that I'll end up back in the hospital at this rate, but I don't have the luxury of worrying about my health at the moment. One of my professors is insistent that they need either LPS or a Dean or someone to "give them permission" to work with me so I can either turn in assignments that are overdue or do some form of makeup work, ect. *[sic]*.

He then continued by stating that he was hesitant to work with the Program again to seek help because of how he had been treated up until that point. He explained, again, how the timeline had been twice changed on him to render his completion impossible, and how purported policies were being made up on the spot and imposed upon him.

66.     Erik received no reply.

67.     On November 26, 2018, Erik emailed Moedano again. He stated,

I stayed up last night trying to get things in to meet some deadlines I had for various classes. I cancelled my plans to go back home for Thanksgiving so I could stay here and work. All I do day in and day out is sleep, eat and work. I went out for about 3 hours to eat dinner with a friend one night over thanksgiving and I felt so guilty for doing it. I have so many due dates and commitments that I can't keep up with them all, it's not humanly possible. I had to stop several times on the walk to the BioMed library just to catch my breath.

I still haven't been able to book any of my follow-up appointments because there literally aren't enough hours in the day. I'm too afraid to go to a Doctor because I don't want to fail anymore assignments and I'm absolutely will not drop anything out of principle -I told LPS this could happen and I will not stand to be penalized for a situation I tried to avoid but have been forced into.

All of my professors think they're being reasonable with their deadlines -and individually they are. But if you multiply the amount of work over 4 classes in a small time frame, it just can't be done.

He went on to reiterate that the Program kept changing his completion deadline.  He said that he had spoken to the Program about the timeline, explained that this might happen, but they would not alter it.  He again asked to meet with a dean and asked for assistance.

68.     Moedano did not reply.

69.     Erik met with Moedano on November 27, 2018.  She told him that she could not reply to emails like the ones he had sent due to a CAPS policy.  Moedano told Erik that she had asked the director of CAPS to meet with him, but the director had declined. She then recommended, yet again, going back to see McLaughlin, despite having been briefed extensively on what she had subjected Erik to.

70.     Erik told Moedano he did not know how much longer his health would last and that he was certain his body was going to give out soon. He told her he was sure he was going to die. He told her he was certain that after his death his family would likely seek legal retribution against Penn and that he didn't want anything to happen to her as she was one of the people who actually tried to help him. He told Moedano that he was going to send her an email that she could show to CAPS if something were to happen to him.

71.     Moedano said he did not have to do that, but Erik reiterated that he did not want his family to come after her if he died.  She thanked him for his consideration.

72.     He sent her the third email that night.

73.     This was the only email Moedano responded to.

74.     Moedano did not call for crisis intervention.  She did not ask him to stay at the office until she could help him get psychiatric help or meet with someone on his behalf.  Put differently, she did not follow CAPS's own guidelines for ensuring the safety of a student in crisis.

75.    On or about December 6th, 2018, Erik met with Moedano for the last time. Moedano told Erik that she had asked the director of CAPS to intervene in Erik's case, but the director had declined to meet with Erik a second time. Moedano had set up a phone call with one of Erik's advisors, Danielle Lever. During this conference call, Lever stated that the Program had been made aware that Erik had expressed having problems with McLaughlin. Despite this, Lever and Moedano again suggested that he meet with McLaughlin. The call ended without any resolution for assisting Erik with his workload or his timeline.

76.    After the phone call, Moedano stated that she did not believe there was anything further that CAPS could do for Erik.

77.    On or about December 16, 2018, Erik attempted suicide by hanging.  He survived and went to the hospital.

78.    He was in the hospital from December 18, 2018, until December 27, 2018. During this time he spoke with SIS and Dr. Manning, another of Penn's agents.

79.    Erik never completed his courses for the Fall 2018 semester.  Over the winter break of that school year, he had several conversations with SIS, as did his mother on his behalf. Erik told Lindsay Adams and Lauren Rudick both of SIS, numerous times that he could not work with McLaughlin.  He expressly identified working with her as a trigger for him, and they were aware that McLaughlin was responsible for most of his challenges in school.  His mother relayed the same information.

80.    Erik asked to meet with someone else—anyone else—from the University.

81.    SIS scheduled a meeting with Erik and his mother for January 22, 2019.  They included McLaughlin.  Erik replied to the emailing notifying him of this and stated:

> Thank you for the communication and opportunity to meet. I do want to meet today, but ask that Jackie please not attend. I spoke with my psychiatrist about meeting

with her and how the idea was affecting me. He expressed concern that meeting with her directly at this time could be re-traumatizing, and advised that I not do so. I will look forward to seeing you later today unless you advise me otherwise. If you need time to re-schedule without Jackie, please let me know and I'll look forward to meeting you then.

82.     Erik and his mother arrived at the school for the meeting and Jackie McLaughlin was present.  Erik experienced an acute attack of his anxiety and left the meeting.  He collapsed at the school in the parking lot and struck his head on the concrete.  Erik had to be taken to be taken to the hospital via ambulance.

83.     On or about the second week of February 2019, Erik received a letter from Mclaughlin stating that the Program was aware he was hospitalized in December, and that he would likely not complete his courses for the Fall 2018 semester.  As a result, Penn was placing him on a mandatory leave of absence.

84.     By the time Erik received the letter from McLaughlin, Penn had locked him out of most of his access to accounts, to campus, and to campus resources.  Despite this, the letter from McLaughlin stated that he had four weeks to complete Cell Signaling, and until the end of that semester to complete his other courses, an obvious and complete impossibility.  The letter was a constructive discharge from the Program.

## COUNT I
### Violation of Title III of the ADA, 42 U.S.C. § 12182(a).

85.     Paragraphs 1 through 84 are incorporated here by reference.

86.     Erik is a student with disabilities.  Erik is diagnosed with neuropathy, major depressive disorder, and post-traumatic stress disorder.  At the time he attended Penn, he experienced nerve pain and numerous manifestations of acute stress, including heart palpitations, insomnia, hypersomnolence, inability to concentrate, headaches, gastrointestinal issues, and

suicidal ideation, all of which were and are debilitating and substantially limit major life activities.

87. Defendant is a private school and place of public accommodation as defined under Title III of the ADA, 42 U.S.C. § 12102(7).

88. Erik is qualified to participate in the Program. Erik came to the program with two degrees in neuroscience. He graduated with a Master's in neuroscience. Erik maintained a grade point average above a 3.0 in the Program, despite his disabilities and the discrimination from the school. During his time in the post-baccalaureate program, Erik also interned at Penn Presbyterian Hospital and the Hospital of the University of Pennsylvania in the Division of Clinical Ultrasound. In this time he was featured in Nephrology Times and presented his research at international medical conferences hosted by the American Society of Nephrology, and by the American Cardio Renal Society. He went on to present on Penn's behalf to the National Kidney Foundation and the World Congress of Ultrasound in Medical Education.

89. With reasonable accommodations, Erik is fully capable of meeting the academic standards of the Program. Such accommodations would not fundamentally alter the nature of the College of Liberal and Professional Studies Post-Baccalaureate program.

90. The University of Pennsylvania intentionally and explicitly discriminated against Erik because of his disabilities by needlessly and without legitimate reason altering his deadline for completion of the Program, while being fully aware of his disabilities and his increasing stress and inability to address his health needs.

91. In addition, University of Pennsylvania faculty explicitly told Erik that because of his disabilities, he should not be enrolled in the Program, and should not pursue attending medical school.

92.     Faculty made overtly discriminatory statements against all people with disabilities, mocked Erik's disabilities, and dismissed the challenges Erik faced because of them, and because of the discrimination by the University on the whole.

93.     It is evident that Penn mistreated Erik by repeatedly ignoring his mental health needs and his physical needs, and by leaving the control of his programming and accommodations to McLaughlin, who was the exact person who caused him the most distress. Penn's actions towards Erik, which included

    a.    Shortening Erik's time to finish the Program;
    b.    Requiring him to take only one course of McLaughlin's choice;
    c.    Permitting him to take any choice he wanted but at the cost of losing another semester of time to complete the Program;
    d.    Requiring him to meet repeatedly with McLaughlin even after he identified her as a trigger for his disabilities;
    e.    Refusing him appropriate medical leaves;
    f.    Refusing him promised crisis support; and
    g.    Ultimately dismissing him,

had no perceptible, legitimate cause.  It is the demeaning statements about Erik's disabilities and persons with disabilities by Penn's agents that shed light on the reasons for such gross maltreatment.

94.     Penn has thus prevented Erik from the full and equal enjoyment of the educational program that it provides to Erik's non-disabled peers.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter an Order as follows:

(a)     Granting judgment for the Plaintiff and against Defendant;

(b)     Injunctive relief in the form of reversing Defendant's dismissal of Erik and granting him a withdrawal at the completion of the Summer 2018 semester;

(c)     Reimburse Erik for the cost of the Program;

(d)     An award of attorney's fees and costs; and

(e)     Grant such other relief as the Court deems equitable and just.

## COUNT II
### Violation of Section 504 of the Rehabilitation Act, 29 U.S.C.S. § 794.

95.     Paragraphs 1 through 94 are incorporated here by reference.

96.     Erik is a student with disabilities.  Erik is diagnosed with neuropathy, major depressive disorder, and post-traumatic stress disorder.  At the time he attended Penn, he experienced nerve pain and numerous manifestations of acute stress, including heart palpitations, insomnia, hypersomnolence, inability to concentrate, headaches, gastrointestinal issues, and suicidal ideation, all of which were and are debilitating and substantially limit major life activities.

97.     Defendant is a recipient of federal financial assistance in the form of federal student loan and grant monies.  *See* 29 U.S.C. § 794(a).

98.     Erik is qualified to participate in the Program.  Erik came to the program with two degrees in neuroscience.  He graduated with a Master's in neuroscience. Erik maintained a grade point average above a 3.0 in the Program, despite his disabilities and the discrimination from the school.  During his time in the post-baccalaureate program, Erik also worked at Penn Presbyterian Hospital and the Hospital of the University of Pennsylvania in the Division of Clinical Ultrasound.  In this time he was featured in Nephrology Times and presented his research at international medical conferences hosted by the American Society of Nephrology, and by the American Cardio Renal Society.  He went on to present on Penn's behalf to the National Kidney Foundation and the World Congress of Ultrasound in Medical Education.

99.     With reasonable accommodations, Erik is fully capable of meeting the academic

standards of the Program.  Such accommodations would not fundamentally alter the nature of the

College of Liberal and Professional Studies Post-Baccalaureate program.

100.     It is evident that Penn mistreated Erik by repeatedly ignoring his mental health

needs and his physical needs, and by leaving the control of his programming and

accommodations to McLaughlin, who was the exact person who caused him the most distress.

Penn's actions towards Erik, which included

- a. Shortening Erik's time to finish the Program;
- b. Requiring him to take only one course of McLaughlin's choice;
- c. Permitting him to take any choice he wanted but at the cost of losing another semester of time to complete the Program;
- d. Requiring him to meet repeatedly with McLaughlin even after he identified her as a trigger for his disabilities;
- e. Refusing him appropriate medical leaves;
- f. Refusing him promised crisis support; and
- g. Ultimately dismissing him,

had no perceptible, legitimate cause.  It is the demeaning statements about Erik's disabilities and

persons with disabilities by Penn's agents that shed light on the reasons for such gross

maltreatment.

101.     Moreover, it is clear from Penn's actions and the statements of its agents that

Penn's mistreatment of Erik arose at least from reckless disregard of his disabilities, and likely

from an intentionally discriminatory desire to engineer his dismissal from the Program because

of his disabilities.

102.     Penn's admonition to Erik in November 2018, through its agent, Dr. Cancro, that

Erik, as a person with disabilities, should "learn to live with" the idea that Erik will and should

be rejected from medical school because of his disabilities, and that that was for the best, was,

even standing alone, manifestly and grossly unjust.  Put in context (a statement made to a student

that Penn knew was in crisis due, in part, to his disabilities, during a meeting where that student was asking for help to get himself out of crisis), it was shockingly cruel. It was also intimidating since Dr. Cancro repeatedly stated that he was on the admissions committee for the Perelman School of Medicine, enrollment at which was an obvious ambition of Erik's.

103. Similarly, Penn's failure to follow its own policies and procedures for helping students in crisis speaks to a disregard for Erik's well-being that crosses the line from mere negligence to reckless, and dangerous, disregard.

104. Penn thereby prevented Erik from the full and equal enjoyment of the educational program that it provides to Erik's non-disabled peers.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter an Order as follows:

(a) Granting judgment for the Plaintiff and against Defendant;

(b) Awarding compensatory damages to Plaintiff against Defendant;

(c) Awarding punitive damages to Plaintiff against Defendant;

(d) An award of attorney's fees and costs; and

(e) Granting such other relief as the Court deems equitable and just.

## COUNT III– BREACH OF CONTRACT

105. Paragraphs 1 through 104 are incorporated here by reference.

106. As set forth in detail above, Defendant knowingly, repeatedly, and persistently enforced on Erik arbitrary deadlines for completion of the Program that were contrary to Defendant's own policies and procedures.

107. The Handbook and all public-facing information for Defendant's College of Liberal and Professional Studies makes clear that a student's schedule is meant to be

individualized, and should not include so many courses that the student is unable to complete them to satisfaction.

108.     The Handbook and Defendant's public-facing information for the Program contain no deadline for completion of the program.  *See* Post-Baccalaureate Pre-Health Programs Student Handbook, at 4, lps.upenn.edu/sites/default/files/2020-10/prehealth-handbook-2020-2021.pdf.  The University also states that a leave of absence should last as long as is appropriate for the individual student.  *See* Penn LPS Leave of Absence Policy, at lps.upenn.edu/students/forms ("Students typically take a leave for a full academic year. Individual circumstances may require more of less time; the length of the leave is determined by the school.").

109.     Defendant, through McLaughlin, nonetheless enforced a leave of absence policy upon Erik that did not exist by denying that a leave of less than a year was possible.  Defendant did so in response to Erik's reasonable request for accommodations for his disability, and contrary to both its policies regarding services for students with disabilities and its promise that schedules will be made to suit the individual student in the Program.

110.     Defendant forced Erik to take certain courses.  This was again contrary to the Program's handbook, which does not enforce any curriculum and, again, advertises that the experience will be individualized to the needs and professional goals of each student.

111.     Defendant's punitive and arbitrary invention of rules for Erik alone, which rules conflicted with Defendant's own policies and rendered Erik's completion of the Program impossible, constituted a breach of Defendant's contract with Erik.

112.     So, too, did Defendant's failure to follow its own guidelines for helping to ensure the safety and well-being of students experiencing a crisis that puts them at risk of self-harm or

suicide.

113.    These breaches caused the Plaintiff tremendous and enduring harm.  He spent thousands of dollars in tuition for a program that Defendant rendered impossible to complete.  He was hospitalized repeatedly during the Program due to the stress that Defendant's breaches of its contract with him, combined with his known disabilities, caused him.  He was driven to attempt suicide.  And then, in January 2019, after his suicide attempt, and after Erik had indicated that McLaughlin was a trigger for the very symptoms that had driven him to suicide, Penn continued to insist that McLaughlin would remain the gatekeeper for his continued participation and progress in the program.  The anxiety-related blackout that Erik suffered as a result of Penn's insistence on McLaughlin's continued control over his course of study resulted in a serious head injury and further hospitalization.

114.    As a result of this breach of contract, Erik finds himself at what is, essentially, square one on his journey to medical school and in pursuit of his dream of becoming a doctor.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter an Order as follows:

(a)    Finding that Defendant University of Pennsylvania breached the parties' Agreement;

(b)    Granting judgment for the Plaintiff and against Defendant;

(c)    Awarding compensatory damages to Plaintiff against Defendant in excess of $75,000 for the breach of their contract and its foreseeable harms; and

(d)    Granting such other relief as the Court deems equitable and just.

Dated: November 5, 2020                             Respectfully submitted,

Michael D. Raffaele (PA ID 91615)
Gillian M. Dagress (PA ID 313370)
Raffaele & Associates, LLC
1230 County Line Road
Bryn Mawr, PA 19010
T: (610) 922-4200 / F: (610) 646-0888
E: Michael@MyKidsLawyer.com

*Counsel for Plaintiff*