IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIK YARMEY | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 20-5535 |
| UNIVERSITY OF PENNSYLVANIA | : | |

MEMORANDUM

SURRICK, J.                                                    NOVEMBER 15, 2024

Plaintiff Erik Yarmey ("Plaintiff" or "Yarmey") asserts causes of action against Defendant University of Pennsylvania ("Defendant" or "Penn") for violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq., (Count I); violation of Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, (Count II), and breach of contract under Pennsylvania law (Count III).  (Complaint, ECF No. 1.)  Penn moves for summary judgment on all counts.  For the following reasons, Defendant's Motion will be granted in its entirety.

## I.    FACTUAL BACKGROUND[1]

Penn's College of Liberal and Professional Studies ("LPS") offers a Post-Baccalaureate Pre-Health Studies Program (the "Pre-Health Program"), which is a non-degree program designed to help students with an undergraduate degree bolster academic credentials before applying to a health professional school such as medical school.  (Pl.'s Response to Def.'s Statement of Facts ("Pl. SOF Resp."), ECF No. 78, ¶ 1).  The Program has two tracks: (1) a Core Studies track for

---

[1] At summary judgment, courts view the facts in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

students who need to complete the core science courses required for entry to a post-baccalaureate health program and (2) a Specialized Studies track for students who have a science background but may need to enhance their academic record to be competitive for graduate school.  (*Id.* ¶ 3.)

Plaintiff applied for full-time admission to the Pre-Health Program's Specialized Studies track and was admitted for the Fall 2017 semester.  (*Id.* ¶ 37.)  Students on the Specialized Studies track meet with a Pre-Health Advisor to create an academic plan.  (LPS Handbook, Penn MSJ Ex. A, ECF No. 75-2, at PENN_0000142.)  Plaintiff met with Ms. Jackie McLaughlin, the director of the Pre-Health Program, for a pre-advising meeting on June 5, 2017 and again on August 31, 2017. (Pl. SOF Resp. ¶¶ 39-41.)  During these meetings, McLaughlin restricted Plaintiff from taking any neuroscience courses because he had a master's degree in neuroscience.  (*Id.* ¶ 42.)  During their second advising meeting, Plaintiff indicated that he had some health issues, and McLaughlin referred Plaintiff to Penn's Student Health Services ("SHS").  (*Id.* ¶¶ 41, 43.)

Plaintiff had several injuries before starting the Pre-Health Program, which included: (i) a severe concussion; (ii) neuropathy caused by two herniated cervical discs affecting the nerve root as it exits the spinal cord; and (iii) a stretch compression injury.  (Pl.'s Counter Statement of Facts ("Counter SOF"), ECF No. 79, ¶ 11 (citing Yarmey Tr. Vol I, ECF No. 75-9, at 113:2-10).)

### A.    2017 Fall Semester

In October 2017, during Yarmey's first semester, he became sick with infections that led to him having a tonsillectomy on or about October 30, 2017.  (Pl. SOF Resp. ¶ 61; Counter SOF ¶ 15.) Although Yarmey was initially hesitant to reach out to administrators, he eventually reported the situation to one of his professors, who referred him to Penn's Student Intervention Services ("SIS").  (*Id.* ¶¶ 48-50.)  Yarmey then met with SIS Executive Director Sharon Smith.  (*Id.*) Yarmey explained that he might need surgery and asked about taking a medical leave of absence, intending to return during the spring of 2018.  (*Id.* ¶¶ 51-52.)  Yarmey also wanted to withdraw

from his fall classes with a transcript notation that the withdrawals were for medical reasons.  (*Id.* ¶ 53.)  Smith reached out to McLaughlin and SIS staff explaining that Yarmey was looking for support taking a leave of absence.   (Penn MSJ Ex. O, ECF No. 75-16.)  McLaughlin explained that Yarmey would need to speak with her.  (Pl. SOF Resp. ¶ 57.)

On November 6, 2017, Yarmey and McLaughlin met to discuss Yarmey's options and McLaughlin explained that he could withdraw from his fall classes or take a leave of absence.  (Pl. SOF Resp. ¶¶ 73-74.)   Yarmey asked for incompletes in Biology 448 and Physics 101 but McLaughlin rejected this proposal.  (Yarmey Tr. Vol. III, ECF No. 75-11, at 106:19-107:1; Counter SOF ¶ 17.)  McLaughlin, who must approve any leave of absence, also would not permit Yarmey to take a leave of absence for under one year or to have a notation on his transcript stating that withdrawals were for medical reasons.  (Pl. SOF Resp. ¶ 77; Counter SOF ¶¶ 20-21.)  Following these discussions, Plaintiff decided to withdraw from his classes, and he submitted drop forms to the LPS office on November 8, 2017.  (Pl. SOF Resp. ¶ 78.)  Plaintiff further indicated that his plan was to register for a few spring courses for the Spring of 2018.  (*Id.*)  McLaughlin confirmed receipt of Plaintiff's withdrawal forms and thanked him for the update.  (*Id.* ¶ 82.)  When Yarmey declined to take a leave of absence, McLaughlin expressed frustration with Plaintiff's decision, and said that she would not tolerate any other setbacks in the program for any reason.  (Yarmey Dep. Tr. Vol. I at 94:3-9.)  McLaughlin also sought assurances that Plaintiff's neuropathy would not impede his completion of the Program.  (Pl. SOF Resp. ¶ 101.)  Plaintiff also testified that based on his meetings with McLaughlin around this time, he understood his timeframe to complete the Pre-Health Program would be extended through 2019.  (Yarmey Tr. Vol. I at 201:15-20.)

Plaintiff also sought services and support from Penn's Counseling & Psychological Services ("CAPS"), and on or around November 11, 2017, he began meeting with CAPS clinical

social worker Carmen Moedano for therapy. (Counter SOF ¶¶ 23-24; Pl. SOF Resp. ¶ 83; Moedano Tr., ECF No. 75-7 at 13:3-5.) During sessions around this time, Yarmey relayed that he was feeling symptoms of depression due to his health issues. (Counter SOF ¶ 32.)

**B.    2018 Spring Semester**

Although Plaintiff would have preferred to take two seminar classes during the spring 2018 semester, McLaughlin insisted that he only sign up for a single class. (Pl. SOF Resp. ¶¶ 107-108). McLaughlin recommended that Yarmey take Biochemistry because she knew the professor, Dr. Ruth Elliott, and believed Dr. Elliott would take good care of him. (*Id.* ¶ 108.)

On January 25, 2018, Plaintiff met with Moedano because of depression symptoms, and she set a treatment plan for monthly appointments with her at CAPS. (*Id.* ¶¶ 110-111.) In mid-March 2018, when Moedano emailed Plaintiff to reschedule their appointment, Yarmey responded that he was busy and "things are going well." (CAPS File, ECF No. 75-21, at PENN_0000078-79.) Yarmey did not seek counseling at CAPS for the remainder of the 2018 semester. (Pl. SOF Resp. at ¶ 119.)

When Plaintiff did poorly on his first biochemistry midterm, he met with Professor Elliott, and explained that the pain caused by his neuropathy prevented him from finishing the exam. (*Id.* ¶ 120-21.) Professor Elliott helped Yarmey contact Student Disability Services ("SDS") to request accommodations, and she allowed Yarmey to reschedule his second midterm while he sought the accommodations. (*Id.* ¶¶ 122-23.) On May 16, 2018, SDS approved permitting Plaintiff one and one-half time on exams and extra breaks, and these accommodations remained in place through

September 30, 2018.  (*Id.* at ¶ 126.)[2]  Plaintiff did not request any other accommodations during the Spring of 2018, and he earned a B+ in Biochemistry.  (*Id.* ¶¶ 130-132.)

### C.    2018 Summer Semester

For the summer 2018 semester, Plaintiff enrolled in Human Anatomy and General Physics. (*Id.* ¶ 133.)  Plaintiff did not need accommodations for Human Anatomy because the course was online, so he could type his answers.  Plaintiff's accommodations remained in place for General Physics.  (*Id.* ¶¶ 134-35.)

Plaintiff missed several classes because of anxiety, gastrointestinal issues, neuropathy, and stress related to certain research practices that he was concerned could harm his patients.  (Yarmey Tr. Vol. I at 134:14-19; Yarmey Tr. Vol. II, ECF No. 75-10 at 21:15-21.)  Plaintiff went to CAPS for help on June 21, 2018.  Moedano saw Plaintiff and wrote in his file that Plaintiff did not feel supported by other departments at Penn and that he was encouraged to reach out to CAPS. (Counter SOF at ¶ 37.)  Around this time Yarmey reported an increase in depressive symptoms such as sadness, loneliness, increase in weight, isolating behavior, low motivation, and irritability. (*See id.*)  In or around June 2018, Plaintiff experienced a panic attack while taking a makeup physics midterm.  (Pl. SOF Resp. ¶ 137.)  Plaintiff explained to his professor, Dr. Jessie Taylor, that he was concerned that if he did not do well in physics he would lose his place in the Program based on comments from McLaughlin.  (*Id.* ¶ 139.)  Dr. Taylor offered to work with Plaintiff to give him an incomplete so that he could have an additional four weeks to complete the coursework. (*See, e.g.,* Penn MSJ Ex. X, ECF No. 75-25, at 2.)  On June 22, 2018, Dr. Taylor emailed Plaintiff,

---

[2] Plaintiff does not dispute he received accommodations permitting him more time and extra breaks when taking tests, but he notes that Penn did not approve certain requests for "accommodations of incompletes" and "more time to finish [the] LPS program."  (*See* Pl. SOF Resp. ¶¶ 124-27.)

encouraging him to take the incomplete and offering to work with him to enter his grade at the best time to positively affect his GPA.  (*Id.*)  In this same correspondence, Dr. Taylor wrote in part:

> I am concerned about you going to med school.  I don't expect you to listen to me at this point but because I think you may need to hear this from several people before you'll pay attention to it, I want to raise the issue here. . . . I worry that the stress of medical school is going to cause flare-ups that make it difficult if not impossible for you to succeed there.

(*Id.* at 3.)

Dr. Taylor further wrote that her "hope is only for [Plaintiff's] success however [he] pursue[s] it."  (*Id.* at 1.)  Plaintiff took an incomplete in Physics so he would have more time to complete the coursework, and he successfully completed his Human Anatomy course on time with an A.  (Pl. SOF Resp. ¶¶ 145, 47.)

On July 19, 2018, Plaintiff requested an advising appointment with Ms. Danielle Lever, and he explained he had the opportunity to conduct his own study based on clinical research and would like to receive credit as an independent study.  (*Id.* ¶ 48.)  Ms. Lever informed Plaintiff that an independent study would not count toward the Program requirements and provided additional information in a follow-up email.  (*Id.*)  On August 1, 2018, Plaintiff informed McLaughlin of his desire to enroll in an independent study, despite his understanding that it would not count towards his completion of the Specialized Program and he would need to pay extra tuition.  (*Id.* ¶¶ 151-54).  Plaintiff believed this would allow him to gain full-time status and keep Texas state residency and health insurance.  (*Id.*)

McLaughlin conveyed her concern that Plaintiff was  pursuing an independent study when he had not yet completed his General Physics course and wrote, "I am informing you now that your career will not be extended beyond spring [2019] term to allow for completion of the Specialized program."  (Penn MSJ Ex. AA, ECF No. 75-28, at 1-2.) At that time, McLaughlin was

6

not aware of any of the alleged conditions or issues Plaintiff had over the summer or those he shared with Professor Taylor. (Pl. SOF Resp. ¶ 161.) Yarmey did not seek to clarify this timeline, and he explained that his rationale was that "[McLaughlin's] position seemed very clear to me, based off of this email. So I did not feel there was any need for further follow-up." (Pl. SOF Resp. ¶ 164; Yarmey Tr. Vol. I at 206:21-207:20.) Plaintiff did not take the independent study; instead, he enrolled in Human Anatomy, Immunobiology, Principles of Drug Action, and Cell Signaling for the fall 2018 semester. (Pl. SOF Resp. ¶ 167.)

### D.    2018 Fall Semester

Although Plaintiff met with SDS early during the summer of 2018 to discuss ongoing accommodations for his neuropathy, they told him to hold off on submitting the paperwork. (*Id.* ¶¶ 165-66.) Plaintiff did not have time to submit the paperwork to SDS toward the start of the fall 2018 semester because, based on McLaughlin's representation, Yarmey "had to essentially engineer that new very intensive coursework to meet [McLaughlin's] new [Program] completion requirements" and so did not renew his accommodations. (Yarmey Tr. Vol. II at 42:1-21.)

Yarmey experienced several health issues throughout the fall 2018 semester, including gastrointestinal issues, heart palpitations, and grogginess. (*Id.* at 63:10-24, 68:1-24.) Yarmey testified that he did not initially raise these concerns because he was extremely busy and did not want to fall behind on his coursework. (*Id.* at 69:1-15.) Yarmey also reported severe depression to his therapist, Moedano, throughout the semester, and he signed a consent form giving CAPS permission to discuss his circumstances for the purpose of advocating on his behalf. (*See* Pl. SOF Resp. ¶¶ 170, 183.)

On October 15, 2018, Plaintiff emailed Dr. John Wagner, who taught Cell Signaling, to say he might miss class because he was "currently in the Obs unit at Thomas Jefferson" and that he

"[has] a chronic health condition that flairs up two or three times/year." (Penn MSJ Ex. BB, ECF No. 75-29; Pl. SOF Resp. ¶¶ 171-72.) Yarmey sought extensions to turn in discussion points and his take-home midterm, which Dr. Wagner granted. (Yarmey Tr. Vol. II at 79:17-80:6.) Dr. Wagner also granted some of Plaintiff's requests for extensions to turn in articles, but Yarmey does not recall which extensions were denied. (Pl. SOF Resp. ¶ 176.)

On October 24, 2018, CAPS therapist Laura Collins recorded that Plaintiff was taking Trentillix for depression and seeing a psychiatrist. (Counter SOF ¶ 44.) On October 28, 2018, Plaintiff emailed Dr. Cancro, who taught Immunobiology, asking for more time to complete his midterms because of medical issues. (Pl. SOF Resp. ¶ 177.) Dr. Cancro responded that Plaintiff could take the make-up exam at a later date if he missed the in-class midterm but said that Plaintiff should still complete the take-home portion. (*Id.* ¶ 178.) Plaintiff informed Dr. Cancro on November 5, 2018 that he had hypersomnia and had essentially been asleep for the past week, and that he had to be admitted to the hospital. (Penn MSJ Ex. CC, ECF No. 75-30, at PENN_0000187.)

On November 14, 2018, Plaintiff emailed Dr. Cancro to request a meeting "to review his situation" because he found himself "in a rather extreme position" that he could no longer navigate on his own. (Penn MSJ Ex. GG, ECF No. 75-34, at PENN_0000196-197.) When they met the following day Yarmey requested to take an incomplete but Dr. Cancro stated he did not provide incompletes. (Yarmey Tr. Vol. II at 95:13-96:4.) Yarmey testified: "We had disagreements about the reasonableness of that schedule, but he did devise a schedule for me to complete coursework by the end of the semester, and I did my best to meet that schedule." (*Id.*) Dr. Cancro emailed this information to his teaching assistants and copied Yarmey. (Penn MSJ Ex. HH, ECF No. 75-35, at 1.) Plaintiff testified that during their November 15, 2018 meeting, Dr. Cancro also stated: "There are people with certain conditions for whom going to medical school is difficult or impossible.

8

And it really is best for all that those people, they just not be allowed to go -- they just not go in the first place." (Yarmey Tr. Vol. I at 142:5-9.)

Plaintiff told Moedano repeatedly during 2018 that he was depressed. (Yarmey Tr. Vol. II at 155:3-156:17.) Plaintiff made comments to Ms. Moedano such as "I'm not going to be here"; "Here's what will happen after I'm gone"; and "I don't think I'm going to live through this thing." (*Id.*; *see also* (Pl. SOF Resp. ¶ 197.)) Plaintiff cancelled his November 13, 2018 appointment with Moedano, stating he had "been tremendously overwhelmed with makeup work" and wanted to provide her a list of what was going on, but was still working on that list. (CAPS file at PENN_0000095.) On November 25, 2018, Yarmey emailed Moedano explaining that some of his professors had been responsive regarding his issues while others were "less so." (*Id.* at PENN_0000096.) Yarmey also stated that he was "not sure if this schedule is humanly possible, even for someone who is completely healthy." (*Id.*)

On November 27, 2018, Plaintiff went to see Moedano, who expressed concern over his physical health, as well as flat affect and slow speech. (Counter SOF ¶ 54.) Yarmey consented to Moedano speaking with Ms. Lever from advising to better understand the process when taking an incomplete and whether there was flexibility regarding Plaintiff's timeframe to complete the Pre-Health Program. (CAPS file at PENN_0000100.) During Plaintiff's next counseling session on November 29, 2018, Moedano proceeded with calling Lever, who relayed that if Plaintiff did not complete his requirement by spring 2019, he could remain in the pre-med program. (*Id.* at PENN_0000105.) Plaintiff shared that he found the information helpful and scheduled an appointment with Moedano for two weeks later. (*Id.*)

Also on November 29, 2018, Plaintiff emailed Dr. Cancro to ask if he could submit his make-up midterm and final paper on Monday, December 3, instead of Friday, November 30, and

Dr. Cancro responded that this would be fine.  (Pl. SOF Resp. ¶ 224.)  On November 30, 2018, Plaintiff emailed Ms. Lever to thank her for the phone conference and to note that the only professor from whom he would be seeking an incomplete was Dr. Wagner, as his other professors had "worked with [him] on a timeline/scheduling so [he] can finish things by the end of finals week."  (*Id.* ¶ 225.)  Plaintiff did not request accommodations through SDS and did not seek a leave of absence during the fall 2018 semester.  (*Id.* ¶ 226; Yarmey Tr. Vol. II at 42:1-21.)

### E.    December 2018

On December 15, 2018, Plaintiff attempted suicide.  (*Id.* ¶ 228.)  On December 18, 2018, Yarmey called Dr. Manning, a faculty member, who then provided Yarmey with the National Suicide Prevention Hotline and immediately called SIS and CAPS.  (*Id.* at ¶ 230.)  That day Lindsay Adams, a crisis counselor from SIS, called Plaintiff and stayed on the phone until he had arrived at Tisch Hospital.  (Pl. SOF Resp. ¶ 231; Rudick Tr., ECF No. 75-8, at 30:8-17, 121:18-122:9.)  Dr. Meeta Kumar from CAPS spoke with Plaintiff following the attempt and reported that "student was barely audible at times, tearful and guarded, [and] reported [] feeling acute emotional pain, sense of hopelessness, academic distress and mistrust of Penn."  (Counter SOF ¶ 62.)

Yarmey received incompletes or extended incompletes in each of his Fall 2018 classes. (McLaughlin Tr., ECF No. 75-4, at 146:4-15.)

### F.    2019 Spring Semester

Yarmey had a brief call with Lindsay Adams on January 14, 2019, and on or around January 17, 2019, Plaintiff and his mother met in person with Adams and SIS Director Lauren Rudick. (Yarmey Tr. Vol. III at 46:21- 48:2; Rudick Tr. at 9:20-10:4, 44:9-13.)  Plaintiff testified that the purpose of the in-person meeting was "[t]o explain the difficulties I was having with Penn and, hopefully, try to figure out some form of accommodations and a plan to get me back on track."

(Yarmey Tr. Vol. III at 48:20-49:3.)  Plaintiff understood that "[t]he next step ... was to schedule a meeting with someone from LPS" and he noted at that time that he did not want McLaughlin to be present.  (*Id.* at 49:9-12.)

On January 22, 2019, Adams emailed Plaintiff that David Bieber, the Executive Director of LPS, and McLaughlin, the Program Director, would meet him and his mother that day at 4 p.m. After Adams followed up, Plaintiff responded at 2:40 p.m.:

> Thank you for the communication and opportunity to meet. I do want to meet today, but ask that Jackie please not attend. I spoke with my psychiatrist about meeting with her and how the idea was affecting me.  He expressed concern that meeting with her directly at this time could be re-traumatizing, and advised that I not do so.

(Penn MSJ Ex. LL, ECF No. 75-39, at PENN_0000250.)  When Plaintiff and his mother arrived they were unexpectedly greeted by McLaughlin, and when McLaughlin went to gather the other meeting attendees, Plaintiff and his mother left.  Plaintiff experienced heart palpitations, and after walking about one block, he passed out, hit his head on the concrete, and was taken by ambulance to the hospital.  (Yarmey Tr. Vol. III at 54:15-55-19.)

On January 23, 2019 Lindsay Adams emailed Plaintiff, "I'm sorry to hear you had to go to the hospital yesterday afternoon.  I have alerted Student Health Services and asked they reach out … In regards to any academic questions you may have, please be in touch with the LPS administration."  (Penn MSJ Ex. LL.)  Plaintiff did not reach out to the LPS administration "because that would invariably lead back to [McLaughlin]."  (Yarmey Tr. Vol. III at 56:14-15.) Yarmey also did not reach out to Dr. Bieber.  (Pl. SOF Resp. ¶ 246.)

By letter dated February 1, 2019, Penn notified Yarmey that he had been placed on a mandatory leave of absence because he had accumulated two or more incompletes.  (Penn MSJ Ex. MM, ECF No. 75-40, at PENN_0000118.)  The letter was signed by McLaughlin and stated in part:

"We are not in a position to assess the extent to which your health challenges may affect your ability to address these academic deficiencies and you declined to meet with us on January 22, 2019. Therefore I am notifying you that it is your responsibility to contact your instructors to make arrangements … You are encouraged to communicate your plans to complete this outstanding work to me or Student Intervention Services.

When you have finished your work and you feel prepared to return from leave, you should confer, either in person or by telephone with the Director of Pre-Health Programs, Jackie McLaughlin. You will be asked to provide in writing a detailed explanation of why you think that you can now be successful in your academic work. You may be asked for additional documents or assessments/evaluations to help determine your readiness to successfully resume course work."

(*Id.*)

Plaintiff testified that, out of his four classes he received three extended incompletes, which permitted him until the end of the Spring semester to complete his coursework. (Yarmey Tr. Vol. II at 115:8-118:5.) Although Dr. Wagner did not provide an extended incomplete, Plaintiff was under the impression that, if he needed more time, Dr. Wagner was willing to revisit the issue. (*Id.*)

Around this time, Plaintiff's online course access was limited and would not load certain pages, and his library access and other resources had been shut down because he was no longer an active student. (Yarmey Tr. Vol. III at 61:1-62:2; Penn MSJ Ex. NN, ECF No. 75-41.) Yarmey attempted to contact Dr. Cancro and Dr. Manning by visiting their offices, but could not gain access to the building because his Penn Card was deactivated. (Pl. SOF Resp. ¶¶ 259-60.) Plaintiff raised his access issues with the Registrar's Office and Penn Card Center and was told he was no longer active as a student in Penn's system. (Yarmey Tr. Vol. III at 61:1-62:2.) Plaintiff testified that he did not contact the LPS administration about his access issues because "that would have led back to [McLaughlin]." (*Id.* at 64:8.) Plaintiff did not complete his outstanding coursework, and his incompletes changed to failures consistent with LPS academic regulations. (LPS Handbook at PENN_0000151; McLaughlin Tr. at 151:5-23.)

II.    **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." *Id.* The court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

III.    **DISCUSSION**

Penn moves for summary judgment on multiple grounds, arguing that (i) Plaintiff lacks standing to seek injunctive relief under the ADA and Section 504 of the RA, (ii) Yarmey's claims are based on time-barred conduct, and (iii) Yarmey cannot make out a claim under the ADA or RA because he is not a qualified individual and was not denied equal access to the Pre-Health Program. Defendant further argues that Yarmey failed to establish deliberate indifference, which is necessary to recover compensatory damages under the RA. Finally, Penn argues that Plaintiff's breach of contract claims fail as a matter of law.

A.    **Penn Did Not Violate the Or ADA and RA.**

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who own, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). "Public accommodation" includes an "undergraduate, or postgraduate private school, or other place of education." 42 U.S.C. § 12181(7)(J). "A school may not discriminate on the basis of a student's disability nor deny a reasonable accommodation to a disabled student." *Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 166 (3d Cir. 2006).

The Third Circuit has held that to prove a claim under both the RA and ADA a plaintiff must show that (1) he or she is disabled, (2) was otherwise qualified to participate in the program,

and (3) was precluded from participating in and/or having meaningful access to a program or service because of their disability. *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013). The Court of Appeals noted that "the RA allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a program solely on the basis of disability, while the ADA covers discrimination on the basis of disability, even if there is another cause as well." *Id.* at 235-36 (footnote omitted).

### 1.    Standing for Injunctive Relief Under ADA and RA.

As an initial matter, Penn argues that Plaintiff lacks standing to pursue injunctive relief under the ADA and RA. To establish standing for injunctive relief under these statutes, Plaintiff must show that he faces real and immediate threat of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 105 (1983). There are two avenues by which Plaintiff may establish standing under the ADA or RA: (1) the intent to return method, and (2) the deterrent effect doctrine. *Hollinger v. Reading Health Sys.*, No. CV 15-5249, 2017 WL 429804, at *4 (E.D. Pa. Jan. 31, 2017). In addition, the relief sought must be future-oriented and preventive rather than remediation for past injuries. *See Kitchens v. United States Med. Licensing*, No. 22-3301, 2023 WL 7230400 at *17-18(E.D. Pa. Oct. 31, 2023) (finding that under Title III of the ADA the expungement of past test scores could not constitute "preventive injunctive relief" and was instead an attempt to ameliorate the lingering effects of past discrimination).

### a.    Intent to Return Method.

Plaintiff cannot show standing with the intent to return method because the undisputed evidence shows that Plaintiff has not made any concrete plans to return to the Pre-Health Program, and any inference that he might return would be highly speculative.

The specific requirements of the intent to return method are: (1) plaintiff has alleged defendant engaged in past discriminatory conduct that violates the ADA; (2) it is reasonable to infer from the allegations and evidence that the discriminatory conduct will continue; and (3) it is reasonable to infer based on the circumstances that the plaintiff intends to return to the place or program in the future. *Garner v. VIST Bank*, Civ. A. No. 12–5258, 2013 WL 6731903, at *5 (E.D. Pa. Dec. 20, 2013).

Here, the undisputed facts show that Plaintiff decided not to complete his coursework for the Pre-Health Program. Despite having the opportunity to follow up with the LPS administrators, he declined to do so. (Yarmey Tr. Vol. III at 63:9-65:21.) In addition, contemporaneous documents further undermine any potential inference that Plaintiff intended to return. In December 2018, Yarmey told a friend, "I'm taking the semester off. No classes. I'm going to get published and work on MCAT full time. My old Attending said he could get me a lab spot at Cooper SOM. I really don't see the downside." (Penn's Reply, ECF No. 97-1, Ex. OO at 1 (under seal); *see also* ECF No. 97-2, Ex. PP (under seal) ("I've decided to take a hiatus from classes this semester to work on my health and finally take the MCAT. I haven't decided if I am going to finish the program at Penn or not yet.").)[3]

### b.    Deterrent Effect Doctrine.

In the alternative, a plaintiff can satisfy the standing requirement by showing that he was deterred from patronizing a public accommodation because of accessibility barriers. *Anderson v.*

---

[3] Although the two referenced exhibits were filed under seal, the excerpted portions quoted above do not implicate privacy considerations that could potentially warrant sealing. "It is well-settled that there exists . . . a common law public right of access to judicial proceedings and records." *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001). To override the common law right of access, "[t]he party seeking to seal any part of a judicial record bears the heavy burden of showing that 'the material is the kind of information that courts will protect' and that 'disclosure will work a clearly defined and serious injury to the party seeking closure.'" *Miller v. Indiana Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984)).

*Franklin Inst.*, 185 F. Supp. 3d 628, 640 (E.D. Pa. 2016).  This test requires a plaintiff to show (i) actual knowledge of barriers that prevent equal access and (ii) a reasonable likelihood that he would use the public place if it were not for the discrimination.  *Id.*  Even under the deterrent effect test, a plaintiff must still show an intent to return to the place of alleged discrimination.  *Hollinger*, 2016 WL 3762987, at *11.

Here, Plaintiff argues that he is hesitant to return to Penn's Pre-Health Program because he is "too afraid of retaliation or another attempted constructive discharge."  (Pl. Opp'n. at 43.) Yarmey further argues that, upon a favorable ruling from this Court, his "fears will be allayed" by "equitable relief in the form of reasonable accommodations[.]  (*Id.*)  Although we recognize this argument could suggest standing for injunctive relief in theory, the undisputed facts here do not support that Plaintiff was discharged, retaliated against, or otherwise barred from attending the Pre-Health Program.  In short, Plaintiff maintained the option of continuing the Pre-Health Program based on the terms set out in the LPS letter dated February 1, 2019, and he had an array of options to continue pursuing that path (*i.e.*, conferring with McLaughlin directly, working closely with his professors, or working with SIS).

Plaintiff lacks standing to seek injunctive relief under the ADA and RA because he lacks actual knowledge of barriers to accessing the Pre-Health Program.  Nevertheless, we must proceed to address Plaintiff's claims for compensatory damages under the RA and breach of contract, and that analysis also reinforces Plaintiff's lack of actual knowledge of barriers to access.

## 2.    Plaintiff's Claims Based on Time-Barred Conduct.

Plaintiff raises several claims that are time-barred.  Because Title III of the ADA and the RA do not contain an express limitations period, the Court looks to the most analogous law, and the Third Circuit has found that Pennsylvania's two-year statute of limitations for personal injuries

applies. *Katz v. Nat'l Bd. of Med. Examiners*, 751 F. App'x 231, 235 (3d Cir. 2018). Since Plaintiff filed his Complaint on November 5, 2020, any claims that accrued before November 5, 2018 are generally time-barred. Plaintiff argues, however, that Penn's discriminatory acts pre-dating November 5, 2018 are still actionable as a continuing violation.

Under the continuing violation doctrine, a plaintiff can sue for actions that occurred outside the applicable limitations period if "a defendant's conduct is part of a continuing practice [and] . . . the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001). To determine whether a practice is continual, we consider (1) whether the violations are part of the same subject matter and (2) whether the violations occurred frequently. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165–67 (3d Cir. 2013). A plaintiff must also point to an affirmative act that took place within the limitations period. *See Cowell*, 263 F.3d at 293 ("The focus of the continuing violations doctrine is on affirmative acts of the defendants."). "All the alleged acts [] must be part of the same unlawful employment practice, meaning they involved similar conduct by the same individuals, suggesting a persistent, ongoing pattern." *Doe v. Mercy Case Cath. Med. Ctr.*, 850 F.3d 545, 566 (3d Cir. 2017) (internal citations omitted). Courts in this circuit have found that requests for accommodation are discrete acts to which the continuing violation doctrine does not apply. *See Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 442 (E.D. Pa. 2014), *aff'd sub nom.*, *Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015); *see also Hilton v. Home Depot, Inc.*, No. 20-5145, 2022 WL 837207 (E.D. Pa. Mar. 21, 2022).

Here, Plaintiff characterizes the conduct of Penn's professors, administrators, and therapists as creating a hostile learning environment. (Pl. Opp'n at 44-48.); *see also Derrick F. v. Red Lion Area Sch. Dist.*, 586 F. Supp. 2d 282, 309-09 (M.D. Pa. 2008) (discussing circumstances

18

under which a hostile learning environment claim may be cognizable without deciding whether the cause of action exists in the Third Circuit). Plaintiff further claims that "the culmination of Penn's discriminatory acts ultimately resulted in failing Plaintiff out of the program in the Spring of 2019," which Plaintiff also characterizes as a constructive discharge from the Pre-Health Program. (Pl. Opp'n at 44-48.)

The time-barred conduct of which Plaintiff complains may generally be grouped into two categories: (1) denials of requests for accommodations and (2) discriminatory comments from faculty and staff. Under Third Circuit case law, Penn's denial of requested accommodations prior to November 5, 2018 are generally discrete acts that accrue at the moment of denial. *See Hilton*, 2022 WL 837207 at * 4 (explaining in analogous ADA employment context that the Third Circuit has rejected reasonable accommodation claims premised on a continuing violation theory) (citing *Mercer*, 608 F. App'x at 63). Here, McLaughlin's denial of Plaintiff's request for a leave of absence under one year and rejection of Plaintiff's request for a particular notation on his transcript occurred well before November 5, 2018, and are time-barred. *See supra* at Section I.A. Likewise, McLaughlin communicated the timeframe for Plaintiff to complete the Pre-Health Program (*i.e.*, by the spring of 2019) in an email dated August 2, 2018. Given that the communication/decision was a discrete act, any claim premised on this communication is also time-barred.

With respect to discriminatory comments, Plaintiff testified his professors made several statements that he believed constitute disability-based discrimination:

- In Spring 2018, Professor Elliott told Plaintiff "something along the lines of, I have a lot of friends who are physicians. I know that's a tough life. I'm just concerned that, you know, given your health problems, that might not be the appropriate career path for you." (Yarmey Tr. Vol. 1 at 93:10-15.)
- In June 2018, Dr. Taylor encouraged Plaintiff to consider whether the stress of medical school would cause health flare ups of his medical condition. (*Id.* at 112:3-11.)

19

- Professor Cancro told Plaintiff in Fall 2018 "[t]here are people with certain conditions for whom going to medical school is difficult or impossible.  And it really is best for all that those people, they just not be allowed to go -- they just not go in the first place." (*Id.* at 142:5-10.)

- Professor Wagner told Plaintiff "if you're going to keep having these health issues … You might want to consider not going in the first place."  (*Id.* at 154:18-22.)

- Moedano, Plaintiff's therapist from CAPS, told Plaintiff, "if you're going to have health issues, medical school is very stressful and . . . it would be very hard to get through it.  You know, the stress would exacerbate your symptoms."  (*Id.* at 159:15-160:23.)

At summary judgment the Court must accept these statements as true.  But, even taken at face value, no reasonable juror could find that these comments show disability-based discrimination that is so severe or pervasive as to constitute a continuing violation.  *See Woods v. Astrazeneca Pharms., L.P.*, No. 19-230, 2023 WL 2393649 at *24 (M.D. Pa. Mar. 7, 2023) (granting summary judgment on hostile work environment claim where statements about medical issues and related missed work time made on numerous occasions over a three-year period did not "contaminate an environment").  Here the comments were sporadic, occurring only once or twice per semester, and were from separate professors and staff who were not acting in concert.  In addition, several of the comments demonstrate candid advice for serious reflection – not disability-based animus  –  and many of these same professors worked closely with Plaintiff to accommodate his needs.  (*See, e.g.,* Pl. SOF Resp. ¶¶ 122-32; *Id.* ¶¶ 177-78; Penn MSJ Ex. X.)  In short, even when taken together, these comments did not create a single actionable discrimination claim that could constitute a continuing violation.

For these reasons, the continuing violation doctrine does not apply.  To the extent Plaintiff raises claims premised on conduct prior to November 5, 2018, such claims are time-barred.

### 3.    Plaintiff's Timely ADA And RA Claims Cannot Survive Summary Judgment.

Regarding Plaintiff's timely claims, summary judgment is warranted because the undisputed material facts show that Plaintiff was not denied meaningful access to the Pre-Health Program. "To prove a claim under either the ADA or RA, [p]laintiffs must show that: (1) they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service or benefit because of their disability." *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013) (citing *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 185). If the plaintiff meets his burden of establishing that he was otherwise qualified with or without an accommodation, the burden then shifts to the defendant to show that the plaintiff's "requested accommodation would fundamentally alter the nature of the school's program." *Millington*, 261 F. App'x 363, 367 (3d Cir. 2008).

Notably, the statutes contain different causation standards. *See* 42 U.S.C. § 12132 ("by reason of such disability"); 29 U.S.C. § 794(a) ("solely by reason of her or his disability"). "The RA allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a program solely on the basis of disability, while the ADA covers discrimination on the basis of disability, even if there is another cause as well." *CG*, 734 F.3d at 235. Here, the parties do not dispute that Plaintiff had a covered disability under the ADA and RA. However, they do contest whether Plaintiff was a qualified individual and whether Plaintiff was precluded from accessing the Pre-Health Program based on his disability.

#### a.    *Plaintiff Was Qualified Under the ADA and RA.*

The Parties dispute whether Plaintiff was qualified under the ADA and RA to complete the Pre-Health Program. "An otherwise qualified individual is a person who can meet all of a

program's requirements in spite of a disability, with or without reasonable accommodation." *Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 366 (3d Cir. 2008).

Defendant argues that Plaintiff was not qualified because, despite numerous accommodations that Penn offered, he "decided not to complete his outstanding coursework." (Penn MSJ Mem., ECF No. 75-1, at 37.)  In response, Plaintiff contends that whether he was qualified is a disputed issue that must be resolved by the trier of fact because, prior to fall 2018, he was attending class and performing well academically.  (Pl. Opp'n. at 48-52.)

We agree that, given Plaintiff's academic record there is at least a genuine issue of fact regarding whether Plaintiff was qualified to complete the Pre-Health Program, with or without a reasonable accommodation.  Plaintiff received a B+ in Biochemistry, an A in Human Anatomy, and a B- in General Physics, suggesting that he could be successful when he received appropriate accommodations.  (Penn MSJ Ex. M, ECF No. 75-14.)  In addition, Defendant's argument that Plaintiff was not qualified because he decided not to complete the Pre-Health Program misses the mark.  That Plaintiff decided not to proceed with the Pre-Health Program does not necessarily mean he was not qualified to do so.  We find Plaintiff was a qualified individual under the ADA and RA.

> b.    *Plaintiff Was Not Denied Meaningful Access to, or Full And Equal Enjoyment of, the Pre-Health Program.*

Plaintiff cannot show, however, that he was denied meaningful access to, or full and equal enjoyment of, the Pre-Health Program based on a disability.  The record shows that Penn remained willing to discuss a plan to address Plaintiff's needs, and it was Plaintiff who was unresponsive. Although  the terms "meaningful access" and "full and equal enjoyment" are not clearly defined in the statute, courts in this district have assessed the parameters of this term in similar contexts.

In *Liberty Res., Inc. v. Philadelphia Hous. Auth.*, Judge Brody reviewed relevant authorities regarding these terms and explained:

> [T]the statutory mandates of the RA and ADA only require a program to provide equal access to its core services. If a program provides these core services in a non-discriminatory manner then it has provided meaningful access to its benefits and an expansion of those services is not required by statute or regulation.

528 F. Supp. 2d 553, 567 (E.D. Pa. 2007) (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985)); *see also Nathanson v. Med. Coll. of Philadelphia,* 926 F.2d 1368, 1385 (3rd Cir. 1991) (framing issue as whether or not defendant's failure to provide suitable seating made program "effectively unavailable" to student with a back injury); *see also Berardelli ex rel. M.B. v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 110 (3d Cir. 2018) ("The RA assures 'meaningful access' to federally funded programs . . . and the ADA provides for 'full and equal enjoyment' of public accommodations.").

In his briefing, Plaintiff raises various theories as to why he was denied meaningful access to the Pre-Health Program. First, Plaintiff argues that CAPS and SHS did not adequately share information regarding Plaintiff's depression and Post-Traumatic Stress Disorder with his program administrators or faculty. (Pl. Opp'n at 17-18, 26-27.) Plaintiff claims that since his professors were not aware of his medical issues, they could not offer appropriate accommodations. (*Id.*) Second, Plaintiff argues that Penn did not accommodate his request to remove McLaughlin from involvement in planning his return to the Pre-Health Program during the spring of 2019. (*Id.* at 26, 52, 56.) On the advice of a psychiatrist, Plaintiff believed that any interactions with McLaughlin could be traumatic and affect his mental health, so he wanted to speak with a dean rather than McLaughlin despite her role as the Pre-Health Program Director. (*Id.*) Third, Plaintiff argues that he was put on a mandatory leave of absence, denied access to his course materials, and

constructively discharged from the Pre-Health Program because of his mental health disabilities. (*Id.* at 32-34.)

Defendant argues that the undisputed facts show that Yarmey was not dismissed from the Pre-Health Program, but rather was placed on a mandatory leave of absence consistent with LPS academic regulations because he accrued more than two incompletes in a semester. (Penn SJ Mem. at 28-29.) Defendant further contends that Plaintiff made the affirmative decision not to engage with the Pre-Health Program and he attributed this decision to an unjustified excuse that "all roads lead back to Jackie [McLaughlin]." (*Id.* at 43.) Finally, Defendant chronicles numerous efforts that Penn made to plan for Yarmey's return and successful completion of the Pre-Health Program to show that Penn remained willing to work with Yarmey to account for and accommodate his medical needs. (*Id.* at 44-45.)

The undisputed facts show that Plaintiff had significant opportunities to re-engage with LPS administrators and his professors to discuss a plan to complete his coursework. Plaintiff's argument that he had no options other than working with McLaughlin is belied by the record, which shows that Plaintiff had previously used several other avenues to receive accommodations. (*See id.* at 45.) Specifically, Plaintiff had worked directly with SDS, SIS, Moedano, Lever, and faculty to modify schedules and identify testing accommodations. Moreover, the February 1, 2019 letter explaining that Plaintiff had been placed on a mandatory leave of absence stated that he should "contact [his] professors to make arrangements to complete any outstanding coursework within the allowable timeframes" and encouraged Plaintiff to communicate his plans either directly to McLaughlin "or to Student Intervention Services." (Penn MSJ Ex. MM.) Finally, no reasonable juror could find that Plaintiff had been foreclosed from attempting to complete his outstanding coursework due to issues with his Penn card and student account. Based on the February 1, 2019

letter, Plaintiff knew he was no longer an active student, and he admitted that he did not raise these issues with the LPS administrators.    (Yarmey Tr. Vol. III at 64:5-8.)    Plaintiff's own communications, in which he conveyed that he intended to take a hiatus from the Pre-Health Program and did not know whether he would return, further reinforce this conclusion.  (Penn's Reply Ex. OO, Ex. PP.)[4]

       **B.**    <u>**Penn Did Not Breach Its Contract with Plaintiff.**</u>

"Under Pennsylvania law, the relationship between a private university and a student is contractual, the contract being 'comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of his or her enrollment in the institution.'"  *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 558 (E.D. Pa. 2016) (citing *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)).  A claim for breach of contract "must relate to a specific and identifiable promise that the school failed to honor."  *Id.* (quoting *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x. 129, 133 (3d Cir. 2011)).  Under Pennsylvania law, the elements of a breach of contract claim are (i) the existence of a contract; (ii) a breach of a duty imposed by the contract; and (iii) resultant damages.  *See Orbisonia-Rockhill Joint Mun. Auth. v. Cromwell Twp.*, 978 A.2d 425, 428 (Pa. Commw. Ct. 2009) ("[A] claim for a breach of contract arises when it can be shown that there was a contract, a breach of a duty imposed by that contract and damages that resulted from the breach.") (citing *Gen. State Auth. v. Coleman Cable & Wire Co.*, 365 A.2d 1347, 1349 (Pa. Commw. Ct. 2009)).

---

[4] Defendant also argues that Plaintiff cannot recover compensatory damages under the RA because the undisputed facts fail to show evidence of deliberate indifference.  To show deliberate indifference, Plaintiff must establish "(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge."  *Shadie v. Hazleton Area Sch. Dist.*, 580 F. App'x 67, 70 (3d Cir. 2014) (citing *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248 (3d Cir. 2013)).  Given that summary judgment is warranted on Plaintiff's claims under the ADA and RA for failure to show he was denied access to the Pre-Health Program, we do not reach this issue.

Here, Plaintiff contends that Penn breached the terms of the LPS Handbook because Penn required Yarmey to complete the Pre-Health Program in two years, refused to allow him to take a leave of absence of less than one year, and violated its own guidelines by failing to ensure the safety and well-being of students experiencing a crisis.  (Compl. ¶¶ 106-112.)

### 1.   LPS Handbook Language Regarding Timeframe to Complete the Pre-Health Program.

To support his claim that Penn breached a contract by requiring him to complete the Pre-Health Program in two years, Plaintiff refers to the following language from the LPS Handbook:

> All new students are required to meet with a Pre-Health Advisor to create an academic plan.  While variations must be made to accommodate each student's plans and academic background, Specialized Studies students can complete courses full-time or part-time.

(LPS Handbook at 3.)  However, the same provision states, "Full-time students in the program will take four courses per term, usually in biology or neuroscience, and complete their studies in 2 semesters."  (*Id.*)  Moreover, it is undisputed that Yarmey initially sought admission for the Specialized Studies track as a full-time student and expressed concerns regarding maintaining his full-time status.  (Pl. SOF Resp. ¶ 34; Penn MSJ Ex. AA.)  Comparing the undisputed facts to the language in the LPS Handbook shows that Plaintiff was provided significantly more time than two semesters.  Since Plaintiff was permitted an extended timeframe (*i.e.*, two years), his breach of contract claim on this basis cannot proceed.

### 2.   Under the Leave of Absence Policy, Penn Retained Discretion to Determine the Length of a Leave of Absence.

The Leave of Absence Policy states that "students typically take a leave for a full academic year," but that "the length of leave is determined by the school."  (Penn MSJ Ex. D, ECF No. 75-5, at 3.)  Under the clear terms of the Policy, LPS retains discretion to determine the length of a student's leave.  Plaintiff cannot maintain a breach of contract based on the Leave of Absence

Policy where the school reserves the right to determine the length of a student's leave. *See Crabtree v. California Univ. of Pennsylvania*, 606 A.2d 1239 (1990), *aff'd*, 604 A.2d 1024 (Pa. 1992) (a university's decision to alter a certification requirement was not a breach because the course catalog allowed the university the right to alter the statements contained in the document).

> 3.    **Plaintiff Fails to Identify Binding Contractual Language Regarding Penn's Mental Health Counseling Obligations.**

Plaintiff argues that Penn breached its contract with Plaintiff by failing to provide the mental health care and crisis management necessary to support Plaintiff, which Plaintiff claims led to the deterioration of his mental health and suicide attempt. (Pl. Opp'n at 69-70.) To support this argument, Plaintiff makes only generic references to the LPS Handbook and does not specify any particular provisions or contractual language. (*Id.*) Since Plaintiff cannot identify the basis for a contractual duty regarding the sufficiency of mental health counseling, his breach of contract claim on this point cannot withstand summary judgment. *See David*, 187 F. Supp. 3d at 561 (granting motion to dismiss breach of contract claims where "Plaintiff has failed to identify a specific contractual duty imposed" and explaining that "[w]ithout an identified contractual obligation, the Court is unable to look at the University's actions or inactions to determine whether it has in fact adhered to those contractual duties in good faith.")

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Penn's motion for summary judgment will be granted in its entirety.